E. E. Keenan, along with my co-counsel Sonal Bhatia, it is our privilege to represent Teresa Yearns. Your Honor, Teresa Yearns worked for Koss Construction Company for two years, and according to the reviews of its loss prevention and compliance officer who oversaw its training programs, she had a good to very good performance record. But she made complaints of unequal pay as a woman starting in June of 2015. She continued that complaint process, complying with the company's internal investigation in July and August of 2015. The record reflects, according to Koss' own human resources manager, Alan Payne, that Ms. Yearns' supervisor, David Vestal, learned of these complaints in late July or August of 2015, and in connection with learning of them, said if we didn't have all these women, we wouldn't have these problems. Within a matter of weeks, and only two days after Ms. Yearns sent an email to Mr. Vestal following up on her pay-related complaints, her employment was terminated. The district court granted summary judgment, and in doing so, went against this court's instruction of the standard on summary judgment in Torgerson, and against this court's controlling precedent in Donovan v. Oakley Grain. I'd like to outline in the brief time I have today, what some of the key errors are that the district court made in its analysis. Of course, this court's review is de novo, but I think it's helpful to go through the district court's opinion to see what the issues were and why summary judgment is not appropriate in this case. First off, there are a couple of key facts in the record that were before the district court that the district court simply got wrong. It simply miscited. There's maybe no other way to put it other than it's a citation error or a clerical error or something like that. For instance, the district court says in its decision that Ms. Yearns' complaint following up as part of the investigation in July of 2015 and early August was just some random talk with a co-worker about her wages. But the record discloses in Ms. Harmon and Mr. Payne's depositions, who were both company officials at the time, managerial level officials, Mr. Payne was the head of human resources, that she was making that complaint to them, managerial officers of the company charged with investigating complaints of this nature. The district court also does not grapple with the key timing of when David Vestal, the manager who ultimately discharged Ms. Yearns, learned of that complaint. Mr. Payne makes clear in his deposition that Mr. Vestal first learned of that complaint in late July or August of 2015. And when you read that in conjunction with Rebecca Harmon's testimony about what Mr. Vestal said following learning of that, a reasonable fact finder not just could but must discern that it was after that point that David Vestal learned of her complaint in late July or August of 2015 that he says, if we didn't have all these women, we wouldn't have these problems. It's within a matter of weeks that Ms. Yearns' employment was ended. The district court also attempts to explain away Ms. Yearns' termination by talking about Stephen Tackett, who was the male worker who was transferred from a job site in Arkansas several hundred miles away on 24 hours notice, which he describes as unusual in his experience to replace Ms. Yearns. The district court says he wasn't there to replace Ms. Yearns, but that's not what Mr. Tackett's own deposition says. Mr. Tackett says that when he arrived on the job site, Ms. Yearns was not there. She was gone from the job site by the time he got there. I thought the record showed that he arrived in July before she was laid off. I think that's something that goes to why summary judgment is inappropriate in a case where there are so many factual nuances. If you look at the timesheets, which I think are reflected on pages 496 and 497 of the Joint Appendix, Mr. Tackett worked about 80 hours in July of 2015. We don't have the benefit of his timesheets from the Arkansas job where he was working that was wrapping up at the time. But if you look at his time entries in August of 2015, Mr. Tackett is working 200 and some odd hours. It's about double what Ms. Yearns works in an entire month. In either July, which everybody agrees she was working the full month, she worked about 123 hours, or in August where she worked about the same. Tackett comes in and works a ton of hours. What Tackett's testimony reflects is that when he was brought to the job site to take on the quality control responsibilities full time, Ms. Yearns was not there. And he's very clear in his deposition that he was brought there from Arkansas basically to replace her. This is on page 301 of the Joint Appendix. He says that when he came to the job site in August of 2015, Teresa Yearns wasn't in the lab and he had not worked with her and did not work with her from anywhere from 2014 forward. He said the last time I ever worked with her was in 2014. So any reasonable fact finder could infer that what that means is that if he was working on the job in July of 2015, he certainly wasn't working in the quality control lab with Ms. Yearns. And he's very clear in his testimony on page 301 that when he got up there to do the quality control job, it was coming from Arkansas. This is a company that has people kind of switch positions a fair amount, and that's reflected in the record. I think what a fact finder could infer is he was maybe up and doing this job in Kansas for maybe a couple days or filling in here and there, but then he went back to Arkansas, finished the job up in Arkansas, and then suddenly on 24 hours notice is told, hey, come on up to Kansas, we need you full time. I think that's what the reasonable inference from the record would be. And that's an inference that the district court did not grapple with. What's the explanation for why he had a little bit of hours in July but tons of hours in August? The district court also just disregarded his testimony that, hey, when I got up there, Teresa Yearns was gone. I didn't work with her in the quality control lab. That's something the district court just didn't discuss. The other thing that is problematic about the district court's opinion is that it engages an attempt to weigh the evidence and make effective credibility findings. And the thing that I want to zero in on is the fact that the district court relied very extensively on Rebecca Harmon's declaration. A minimal mistake, there are some important statements in that declaration, but I think the appropriate way to view that declaration is really almost a table of contents or a preview, if you will, of what her testimony was in her deposition. And the district court acknowledges in its opinion that it had the deposition in front of it. Both parties submitted the deposition to the district court, cited it extensively. The district court says that Rebecca Harmon, who was a loss prevention and compliance officer and in charge of the training program, had no basis for her conclusion that Ms. Yearns had good to very good performance. Ms. Harmon makes abundantly clear in her deposition what the basis is for that conclusion and that part of her job as the compliance official and head of EEO investigations and head of the training program was to be aware of the company's records, to talk to the company's managers, to have access to personnel files, to know what the company's policies were including on layoffs. And that's reflected at pages 271, 273, and 274 of the joint appendix. The district court discounts what she has to say even though her deposition gives more than an adequate basis for her to make the statements on personal knowledge that the company's records reflected that Ms. Yearns was a good to very good employee at the time that she was laid off. One thing I want to focus on in terms of the timeline, Your Honors, is the issue of protected activity. And that's another thing that came through in the district court's decision. The district court said that the only protected activity that Ms. Yearns engaged in was her initial oral complaint in June of 2015. But under the Supreme Court's decision in Crawford v. Metropolitan Government of Nashville in Davidson County, as well as this court's decision further back in the County of Ramsey case, participating in an internal investigation, continuing a complaint that you filed earlier, is itself also protected activity. The district court discounts what Ms. Yearns said in her conversation with Alan Payne and Rebecca Harmon in July and August of 2015 as if it was just random idle talk with a coworker. Yes, Your Honor. Let me ask you this. Let's assume you've made a prima facie case. Yes, Your Honor. They assert that she was laid off as a legitimate reason because they were winding down the project there. And I think, correct me if I'm wrong, I think she refused a potential transfer. Is that right? Go ahead, Your Honor. Yes or no? She declined a transfer, but it was never made a condition of continued employment. Okay, so my question is, what is the evidence that that legitimate reason is pretextual? Certainly, Your Honor. There are at least two pieces of evidence of that. First off, the fact that they say, and one of them is just the internal inconsistency of their explanation. They say that sometime, you know, and she testifies in her declaration that sometime in early August of 2015, David Vesta went to her and said, hey, do you want to think about a transfer to this other crew? And she's very clear in her declaration, it's the only direct testimony we have on this, is that David Vesta just floated it as an idea. He didn't make it a condition of continued employment. She said, I really can't do that. And he said, well, let me see what else I have out there for you. Then they laid her off on August 22nd. Well, the internal inconsistency there is one would think that if they truly were just laying her off for lack of work, that the company would re-present to her the option, hey, you know, there is work for you elsewhere. And there is no testimony that they ever did that. The second thing that's really critical here is the separation form that is signed by David Vesta in September of 2015. That's at page 425 of the joint appendix. They code Ms. Yearns as not eligible for rehire. And Rebecca Harmon, as well as Tyson Funk, and we have the actual policy at pages 499 and 500 of the joint appendix, confirm that CASA's policy on do not rehire is when people are separated from employment because of concerns with performance or conduct. That is the situation in which someone is coded as do not rehire. Ms. Harmon and Ms. Yearns make clear in their depositions that this is a seasonal business. And anyone who has spent any time in the construction industry knows that. Layoffs are a standard thing that happen as you go into the fall and winter. But what's also standard is that you plan to call those folks back when the season opens back up. And in their interrogatory responses that are also part of the joint appendix, we see just that. The following summer, late summer, early fall 2016, CASA rehires a man into the very same position that Tracy Yearns was in. Why do they code her as not eligible for rehire if there were no documented concerns, and on that separation form there are none, about her conduct or performance? The company's failure to follow its own policies, especially when as required by Torgerson, viewed in the light most favorable to the non-moving party, required that there be something of an inference credited to the plaintiff that the reason that the employer advances may not be the full reason. And the final thing I'll say on that, Judge Grunder, is while there may have eventually been a need for a seasonal layoff of her, why on August 22nd? Why did she get terminated then? And that goes to that email she sent on the late in the evening of August 20th, so David Vesta wouldn't have gotten it until the following business day, August 21st. He fires her the business day after that. And that really gets to this Court's decision that I think is on all fours on this case. Donovan v. Oakley Grain, which I would encourage the Court to review. I think I am, and I will reserve the rest of my time, Your Honor. I appreciate it. Thank you. Mr. Brown? May I please report? Your Honors, this is quite, this case is quite a bit more simple than Plaintiff Counsel makes it. Theresa Yearns did in fact work for the company for a couple of years throughout that time. She worked primarily as a laborer, but she was promoted at some point to a quality control trainee position. In that position, she had varying levels of performance. She certainly was coded from time to time as good to very good, but there is undoubtedly mistakes that were made with respect to her performance, and the plaintiff herself acknowledges that she made mistakes while doing that job, and some of those were severe. With respect to her allegation that she was terminated and her termination was somehow retaliatory, the evidence in the record simply does not support that. Ms. Yearns was working at a job site in Pratt, Kansas in August of 2015. At that time, that job began to wind down, and that is simply undisputed, Your Honors. The records that we have produced show that the hours on that job reduced dramatically. The records that we show reflect that the numbers of workers were reduced dramatically, and the probably most relevant testimony on this is Yearns' testimony herself, where she talks about the type of work that she is doing immediately prior to the end of her employment is tearing down the job site. She is getting rid of equipment that is no longer going to be used because she understands that that phase of the job is over with and that the company is going to be moving on. So her and every other employee who worked there was given the opportunity to transfer to another job, and it is undisputed that she was offered that opportunity, and she was told that because this job is winding down, we're going to have to move you to somewhere else. She decided that she didn't want to move. The new job was in Nebraska. The evidence in the record shows that she had recently began a relationship with another cost employee who was located in Pratt, and for whatever reason, her reasons being her own, she didn't want to move. So after that, she did not accept that position, did not do anything to ask for another one. There's no follow-up from her about email or otherwise to ask for positions other than the Nebraska one, and at some point, the company becomes aware that she has found other employment. Consistent with the policy of the company, and this is included several places in the record, the company's policy, because it is a construction company, is to routinely lay off workers and at various intervals bring them back. Mrs. Jerns herself had been subject to this a couple times while she had worked there. She had been laid off. She had applied for unemployment. When work had come back around or had increased, she was called back. And so in this instance, rather than filing for unemployment or rather than waiting the period out, she almost immediately sought other employment, and she, by her own testimony in her deposition, she tells David Vestal that, basically, I can't do this anymore, that the unemployment and the taken unemployment during these down times just isn't enough for me, and she says she can't do it anymore, and that's her prerogative. She's certainly entitled to do that, but David Vestal then understands that she doesn't want the job that he's offered her, and she doesn't want the job at cost because that is the nature of the job, and that's undisputed, that her and every other worker, workers, men, women, people that have complained, people that haven't complained, go through these cycles, and the typical thing is just to file for unemployment or do something else. Her undisputed testimony, by her own admission, is that she immediately started looking for another job. She had secured another job by early September. She not only, you know, went to go get a part-time job or, you know, working at 7-Eleven or something. She goes and gets certified to become a school teacher, obtains that job, and relays that information to COSS. And so being aware of this information, COSS, as they had done, not just with her but with several other employees, they code her as a voluntary quit. They code her as having found other employment, and they also code her as not eligible for rehire. And the testimony, and this is from Alan Payne, the person that Plaintiff's counsel referenced before. Plaintiff has characterized the no rehire designation as violative of COSS's policies. It is not at all violative of the policies. It's actually completely consistent with them. Alan Payne, the person who he describes as the human resources director, testified under oath that there are a lot of times when people are marked not eligible for rehire because they found other employment. So that's the application of the policy. That's how it is applied. That's how it had been applied. And his testimony directly was that happens a lot of times. He further says that there are also times when people are marked not eligible for rehire, and they are, in fact, rehired. So one of the problems that Plaintiff has with using this not eligible for rehire as somehow a basis for claiming that she was terminated or retaliated against or as something that would defeat, that would show pretext and defeat the legitimate reason for the termination, is that it's not at all what they believe it to be. It is not some type of panacea that, you know, washes over an employee and black balls them or makes them somehow never eligible to work there again. In fact, the employees that Mr. Keenan just referred to, we produced evidence of employees that were marked not eligible for rehire because they had found other work. We produced evidence of employees that were marked not eligible for rehire who were, in fact, rehired. So the entire premise of her statement that she was retaliated against falls flat because the no rehire provision does not mean what they believe it means, and the evidence in the record shows that our application of the policy with Mrs. Yearns is consistent with how we had applied the policy in the past, how we had applied it to men, and how we had applied it to people that had never made any kind of complaint. So the other thing that… You admit, though, that it seems a little odd to have a box that says not eligible for rehire when, in fact, the policy is you are eligible to rehire. Yeah. And, Your Honor, the way… And I agree with that. But the reason why that is is because… Let me ask. Sure. Is it odd enough that it raises a fact question that a jury might be better able to decide? Not given the evidence in the record. And that's because the nature of the job is such that there are people who take this job and believe that, hey, perhaps the grass is greener on the other side, and they go look for other jobs. But it is very common. It's a pretty high-paying job. It is a seasonal thing, and it is very common. And there's testimony to this fact. It's very common that people can get a job that works in the interim, but it doesn't pay at the rate that the cost job does. So when they hear that cost is back laying roads and doing things, they come back and they go to work for them. And we've got scores and scores of people that do that very thing. And so, again, the not eligible to rehire, it just does not mean what the plaintiff is attributing it to mean. Is there any evidence that people who took other jobs were marked eligible for rehire? I'm not following you, Judge. Say that again. Is there any evidence that someone who was known to have taken another job was coded as eligible for rehire? I'm certain that probably happened at some point. I'm just trying to see if this, because I think the way you're explaining it, the policy is if they take another job, they're not eligible for rehire. Well, and, Your Honor, the truth of it is that's not always communicated to us. So the form that Mr. Keene is referring to, it's a form that has approximately ten boxes in the top, and it has all kinds of things from found other employment, they moved, they don't want to transfer. It has a number of items, and that's just one of them. And to be honest with you, Judge, we sometimes don't get anything. People just leave and they don't tell us why they're leaving, and there's nothing marked in those boxes. And to the extent that the plaintiff makes an issue out of the no rehire and then there is a box in there that has an explanation, the explanation is on the page. It is mentioned a couple times that she states unemployment is not enough. That's written on the form. Found another job. That's written on the form. And, again, if you go to Ms. Shuren's testimony herself, she states that I told him those things. So it isn't a stretch to believe that we knew those and understood them and accepted them from her. So with respect to the argument that there is pretext here, again, it's hard for the plaintiff to characterize Mr. Bestel as being retaliatory to the plaintiff when he did, in fact, offer her a job. Now, the plaintiff has alleged that she didn't take the job because she didn't want to work with that supervisor and that he apparently had made a pass at her at some point in the past. What is important to point out to the court with respect to that is, in her testimony, in her deposition, I asked her if she had ever explained to Mr. prior to being offered this position, if she had ever explained to Mr. Bestel that this gentleman had made a pass at her, that she was uncomfortable working for him. She said she had not. So at the time that Mr. Bestel offered her this job, Mr. Bestel had no reason to believe that she was not going to accept that job. He was not aware of this. She testified under oath that she did not tell him about this. She hadn't told anyone at cost. So there was no reason for him to know that by offering her the position, she wouldn't take it. So regardless of what Ms. Harmon has to say, and there is some discrepancy in the record with respect to this, regardless of what Ms. Harmon has to say about the statement she allegedly attributes to him, that she isn't sure about the time frame, if it was said, whenever it was said, it was certainly said before Mr. Bestel offered this job to Ms. Yearn. So with respect to Mr. Bestel and what his motivations are and whether he was, in fact, retaliating against her, it wipes away any notion that even if he said that statement, that he acted on it when after he allegedly was told it, he then offers her an unconditional job. And then one last thing, Your Honor, that I want to speak to with respect to the job and the comment from plaintiff's counsel that she was never offered a different position or an alternative position. You know, this court is not to set as a super personnel department and to dictate to costs how it should run its business or what it should do. I think the notion that plaintiff is trying to get forward is that when Ms. Yearns says, I know you've offered me a job, but I don't want to take it, that they have some kind of duty to say, well, how about a job in Kalamazoo, Michigan? How about we send you to Florida? How about we send you to California? They don't have the duty to do that, and there is no evidence that they ever did that for anybody else. So the burden is not on them to come up with a job that she likes. There is no testimony that they ever did that for anybody. In fact, the testimony with respect to Mr. Tackett shows that he was a 20-year employee, and when his boss called him and told him, come to Pratt, he went to Pratt. He didn't say, well, I'd like to go to Topeka or maybe you can send me over to Oklahoma. He went where he was told, which is what all the employees, men or women, people that have filed a complaint and people that have not, that's what they all were required to do. Now, with respect to Mr. Tackett, I just want to clear the record up on that. You know, quite frankly, I don't know where the statements that Mr. Keenan attributes to him come from, but I can tell the court this. If the court simply looks at the joint of pigments on page 111, Mr. Tackett says in no uncertain terms and explicitly, I was not sent to Pratt to replace Teresa Youngs. So the notion that he somehow was summoned there to replace her or that she was fired and then he was sent to replace her as a part of this retaliatory act is just completely unfounded. There is no evidence of that. And the, again, undisputed records show that Mr. Tackett had worked at that Pratt plant before. And again, using not Cos' words but using Mrs. Yearns' words, she describes the work that she is doing at Pratt immediately before she's separated from employment, and she's not doing quality control work. She's not doing the quality tech job. She is not in a lab. She is not sifting through samples of gravel. She is not testing those for accuracy and compliance with the contract. She is doing teardown work, and that is not something that Mr. Tackett ever does. So the notion that he was somehow sent there to replace her is contrary to the records in the case, and it's also contrary to plaintiff's own direct testimony. Unless there's any questions, Your Honors, I believe that's all I have. Thank you. If there are none, thank you. Thank you, Your Honors. In the brief time that I have remaining, I'd like to address this issue of the no rehire form. I think that really gets to why this case should go to a jury. There are so many stories and versions being told of what this policy is and what the practice is, but what we do know from the record is what the policy reads. It's on pages 499 and 500 of the joint appendix, and it says two things. Layoff means termination of employment on initiative of the company under circumstances normally lack of work, such that the employee is subject to recall. Bless you, Your Honor. The next says discharge due to performance means termination of employment, et cetera, and you're not subject to recall at that point. If Ms. Yearns truly was laid off for lack of work, why is that box not eligible for rehire checked? And if that box not eligible for rehire being checked means that you can, in fact, be rehired, why do they not call her back? And I'd also bring this Court's attention to pages 267. Yes, Your Honor. Might the answer be that she said, apparently, correct me if I'm wrong, that I'm tired of this layoff situation and unemployment and I'm going to go off and become a teacher? And I'll answer the Court's question. On pages 267 as well as 247 of the joint appendix, this is in her declaration as well as in her deposition, she was asked under oath by Mr. Brown in her deposition, you know, did you say to them, unemployment's not, or maybe asked by us, but she testifies that she did not say to the company, hey, unemployment is not enough, I have found another job and I don't want to be rehired. She never said that. More importantly, she makes clear in her declaration that she never informed anyone at Cost Construction Company that she had found a new job. She just never told them. What we have here is conflicting versions. That's why we have a trial. We would ask the Court to reverse in compliance with Donathan and Torgerson. Thank you, Your Honors.